IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| SOFIA MYERS et al., <br> *Plaintiffs* <br><br> v. <br><br> STEPHEN F. AUSTIN STATE UNIVERSITY, <br> *Defendant.* | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | CIVIL ACTION NO. 9:25-CV-00187-MJT |

**DEFENDANT'S SUR-REPLY IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

Defendant Stephen F. Austin State University ("SFA") files this Sur-Reply in Response to Plaintiffs' Reply (ECF No. 14) and in support of its Response in Opposition to Plaintiffs' Emergency Motion for Preliminary Injunction (ECF No. 10). SFA respectfully shows as follows:

**I.    ARGUMENT AND AUTHORITIES**

**A. The 1979 Policy Interpretation is not entitled to *Chevron* or *Auer* deference, and *Pederson* is no longer good law.**

SFA does not dispute that *Pederson v. Louisiana State Univ.*, 213 F.3d 858 (5th Cir. 2000) is the only case that Plaintiffs cite from the Fifth Circuit. However, Plaintiffs misunderstand *Pederson's* precedential effect in light of the Supreme Court's decisions in *Loper-Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) and *Kisor v. Wilke*, 139 S.Ct. 2400 (2019). Indeed, *Pederson* was decided twenty-five years ago and explicitly relied on the Title IX Policy Interpretations. *See* 213 F.3d 858, 879 ("The proper analytical framework for assessing a Title IX claim can be found in the Policy Interpretations to Title IX…").

Plaintiffs acknowledge the Supreme Court overruled *Chevron* deference, but wrongly claim that *Pederson* is still good law. *See* ECF No. 14 at 3. Although the Supreme Court noted its holding did "not

1

call into question prior cases that relied on the *Chevron* framework," *Pederson* did not apply the two-step *Chevron* analysis (i.e., it did not rely on the *Chevron* framework). *See Loper-Bright*, 603 U.S. at 412 (emphasis added); *see also Pederson*, 213 F.3d at 879. The Supreme Court held only that "[t]he holdings of those cases that *specific agency actions* are lawful…are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Loper-Bright*, 603 U.S. at 412.

The *Chevron* framework set out a two-step process for determining whether a court must defer to an agency's statutory interpretation. *See Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). The first step required the court to use traditional tools of statutory construction to determine whether Congress directly addressed the precise issue before the court. *Id.* at 842. If the statute was clear, the court was to implement Congress's stated intent. *Id.* If the court concluded that a statute was silent or ambiguous, the court then proceeded to *Chevron's* second step, which required it to defer to the agency's reasonable interpretation of the statute. *Id.* at 843. *Pederson* did neither step, nor did it hold that a specific agency action was lawful. It simply unquestionably deferred to the Title IX interpretations. Thus, *Pederson* is not subject to *stare decisis*.1

Plaintiffs also wrongly assert *Loper-Bright* does not apply to the 1979 Policy Interpretation because it "does not interpret a statute" and is instead "an interpretation of a regulation." ECF No. 14 at 3. The 1979 Policy Interpretation, which Plaintiffs attach as Exhibit 2 to their Emergency Motion for Preliminary Injunction, plainly states, "[t]he following Policy Interpretation represents the

---

1 *Tennessee v. Becerra*, 131 F.4th 350, 374 (6th Cir. 2025) ("In support, the Department emphasizes one sentence from *Loper-Bright*—in which the Court said its decision did 'not call into question prior cases that relied on the *Chevron* framework.' So in the Department of Justice's view, apparently, *Chevron* lives on in perpetuity as to any statute that the Supreme Court has ever deemed ambiguous under that doctrine. But the Department studiously overlooks the extent to which lower courts remain bound by the Court's 'prior cases that relied on the *Chevron* framework.' And in the very next sentence of *Loper-Bright*, the Chief Justice was surpassingly clear in defining that extent: 'The holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis* despite our change in interpretive methodology.'").

Department of Health, Education, and Welfare's interpretation of the intercollegiate athletic provisions of <u>Title IX of the Education Amendments of 1972 and its implementing regulation</u>." ECF No. 2-9 at 2 (emphasis added). In support of their facially incorrect assertion, Plaintiffs argue that "[o]ther courts considering the same *Loper Bright* argument advanced by SFA have reached the same conclusion," citing *one* non-binding opinion from a district court in Kentucky. ECF No. 14 at 3.[2] *Loper-Bright is* applicable, in addition to *Kisor*, as SFA explained in its response. *See* ECF No. 10 at 8-13.

Although Plaintiffs recognize the applicability of *Kisor*, they unconvincingly argue that this Court should nonetheless apply *Auer* deference because "[e]very court applying *Auer* deference, even post-*Kisor*, has concluded that Title IX and its implementing regulations are inherently ambiguous and that the Policy Interpretation is reasonable." ECF No. 14 at 3-4. But notably, Plaintiffs cite only one circuit case that was issued <u>post</u>-*Kisor* and <u>pre</u>-*Loper-Bright, Bernsden v. N.D. Univ. Sys.,* 7 F.4th 782, 795 (8th Cir. 2021). *Id.*[3] And in doing so, Plaintiffs do not cite the opinion itself, but only Judge Colloton's concurrence in the judgment. *Id.*

Other than the above assertion, Plaintiffs make no attempt to explain why this Court should give *Auer* deference to the 1979 Policy Interpretation. Plaintiffs' attempt to glaze over *Kisor* is telling because this Court can *only* defer to the 1979 Policy Interpretation if three conditions are met: 1) the

---

2 With all due respect, the Kentucky court was wrong for the reasons discussed above. This issue, among others, is currently on appeal before the Sixth Circuit. *See Elizabeth Niblock, et al v. University of Kentucky, et al*, 24-6060.

3 Plaintiffs' reliance on *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 87 (2d Cir. 2012) and *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1047 (8th Cir. 2002) are of no moment, as they were clearly decided long-before *Kisor* and *Loper-Bright*. Even so, *Chalenor* addressed only the reasonableness of the three-part test and expressly disclaimed it did not address the validity of the 1979 Policy Interpretation. Plaintiffs also cite numerous cases from 1993-2004 which upheld the three-part test. *See* ECF No. 14 at 4 n. 1. SFA does not deny that courts *previously* upheld the three-part test. But Plaintiffs cite to no current, binding or persuasive authority issued post *Loper-Bright* and *Kisor* endorsing the three-part test.

regulation must be ambiguous; 2) if the regulation is ambiguous, the agency's interpretation must be reasonable; and 3) if the regulation is ambiguous and if the agency's interpretation is reasonable, a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight. 139 S.Ct. at 2414-15. "If the *Kisor* factors are applied faithfully, the Three-Part Test does not receive deference." Elizabeth Kaufer Busch & William E. Thro, Restoring Title IX's Constitutional Integrity, 33 Marq. Sports L. Rev. 507 (2022).

In determining whether a regulation is ambiguous, a court "must exhaust all the 'traditional tools' of construction . . .a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read." *Kisor*, 139 S.Ct. at 2415. To make that effort, a court "must 'carefully consider[ ]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* The 1975 Title IX Regulation is clear: if an institution chooses to have sports and chooses to acknowledge the inherent physical differences between the sexes by having sex-segregated teams, then the institution must provide equal athletic opportunities. *See* 34 C.F.R. § 106.41(a). In determining whether an institution is providing equal athletic opportunities, the Regulation plainly states that the Department will consider at least *ten* separate factors. *Id.* § 106.41(c).

Plaintiffs argue that this Court is not required to analyze all ten factors together, reasoning that the "plaint text of Title IX delineates three separate and distinct mandates… [t]hus, the consideration of participation opportunities is independent of whether athletes are treated equitably between genders." ECF No. 14 at 5. Plaintiffs' creative reading of the Regulation simultaneously argues that it is not ambiguous (i.e., "the plain text of Title IX delineates three separate and distinct mandates") and that this Court must utilize the three-part test, which it can *only* do if the Regulation *is* ambiguous. *See Kisor*, 139 S.Ct. at 2415 ("First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous.").

However, the Regulation could not be more clear: "A recipient which operates or sponsors

interscholastic, intercollegiate, club or intramural athletics shall provide <u>equal athletic opportunity</u> for members of both sexes. In determining whether <u>equal opportunities</u> are available the Director will consider, among other factors: [the ten factors]." § 106.41(c) (emphasis added). While the Regulation states that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against," there is no indication whatsoever in its text or structure that the ten factors are not equally relevant to each "separate and distinct mandate[]." The Regulation undoubtedly did not intend for all ten factors to be considered separately, or for one factor to be relevant only to participation opportunities, as Plaintiffs suggest. *See Kisor*, 139 S.Ct. at 2415 ("if uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law."). Because there is no ambiguity, this Court cannot defer to the 1979 Policy Interpretation.

> **B. Because the 1975 Policy Interpretation is not entitled to deference, Plaintiffs cannot show a substantial likelihood of success on the merits to achieve a mandatory injunction.**

Plaintiffs' reply acknowledges they must meet the heightened standard for a mandatory injunction. ECF No. 14 at 15-16. Plaintiffs claim they have met the heightened standard because "SFA's legal arguments rest on a manifest disregard of clear precedent from the Fifth Circuit and the plain text of Title IX and its implementing regulations." *Id.* at 16. As explained above, SFA does not disregard clear precedent because *Pederson* is no longer good law. Further, SFA specifically asks this Court to utilize the plain text of Title IX and its 1975 Regulation. But neither of those include the three-part test. In fact, it is Plaintiffs who advocate for this Court to disregard direction from the Supreme Court because without the three-part test, they cannot show a substantial likelihood of success on the merits.

As explained in its Response, even assuming that SFA does not meet the first factor contained

5

in the 1975 Regulation, it meets the other nine factors used for determining whether equal opportunities are available. *See* ECF No. 10 at 14-15. Rather than argue that SFA does not meet these nine factors, Plaintiffs maintain that the Court is not required to analyze all ten factors. ECF No. 14 at 5. However, the Regulation clearly states that the Director "will consider" the ten factors. 34 C.F.R. § 106.41(c). "Will" is "used to express futurity" or is "used to express a command." https://www.merriam-webster.com/dictionary/will (last accessed July 28, 2025). To "consider" means "to think about carefully, such as to think of especially with regard to taking some action" or "to take into account." https://www.merriam-webster.com/dictionary/consider (last accessed July 28, 2025). The Regulation clearly contemplates consideration of all ten factors when determining whether equal opportunities are provided, and makes no endorsement of one factor's importance over the others.

Unsurprisingly, Plaintiffs continue to rely solely on the three-part test. ECF No. 14 at 6-11. But even if this Court utilizes the three-part test to assess SFA's compliance, it only goes to one of the ten factors ("[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes"). 34 C.F.R. § 106.41(c). Plaintiffs argue "SFA's own Title IX consultant, Helen Grant, both explicitly confirms that the three-part test applies and that SFA was violating it." ECF No. 14 at 1-2.

Ms. Grant states that her "report addresses the compliance status of the athletic provisions of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. Sections 1681 et. seq., and its implementation regulation at 34 C.F.R. Part 106." ECF No. 10-1 at 2. She then states that, "[a]s a means of assessing compliance [she] followed the Policy Interpretation on Intercollegiate Athletics issued by the Office for Civil Rights (OCR) on December 11, 1979, 44 Fed. Reg. 71413 et. seq. (1979)."

*Id.* Although very qualified in her field, Ms. Grant is not an attorney and like Dr. Lopiano4, cannot render legal conclusions. *See Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) ("Experts cannot 'render conclusions of law' or provide opinions on legal issues."). And in evaluating the 1975 Regulation, based on her review of documents, facilities, and conversations with coaches and athletes, Ms. Grant found there was equivalent treatment between men and women with respect to the remaining nine factors. ECF No. 10-1 at 4-7.

Moreover, Plaintiffs argue that SFA "proffers participation numbers for 2024-25 without any evidence to support their accuracy." ECF No. 14 at 6. But that is not true, SFA provided the affidavit of its Athletic Director, Michael McBroom, who stated he has personal knowledge of the facts therein. *See* ECF No. 10-2 at 1. He stated he is responsible for all operations of the university's National Collegiate Athletic Association ("NCAA") Division I intercollegiate Athletics Department. *Id.* Director McBroom is certainly qualified to testify to the Athletic Department's participation numbers.

Plaintiffs also argue that this Court cannot count the cheer and dance teams, citing to another non-binding circuit court case which is distinguishable from the testimony the Court will hear, and their purported expert, Dr. Lopiano. ECF No. 14 at 8-9. Dr. Lopiano bases her opinion that cheer and dance do not count for Title IX purposes on the Office of Civil Rights ("OCR") 2008 Dear Colleague Letter. *See* ECF No. 14-2 at 16. It is indisputable that this document is nothing more than

---

4 In fact, Dr. Lopiano's testimony has been excluded before on this precise ground. *See Niblock v. Univ. of Kentucky*, No. CV 5:19-394-KKC, 2023 WL 4842315, at *2 (E.D. Ky. July 28, 2023) ("Lopiano cannot interpret what Title IX means, nor can she seek to interpret the law as applied to UK's practices."); *Anders v. California State Univ., Fresno*, No. 1:21-CV-179-AWI-BAM, 2021 WL 1564448, at *11 (E.D. Cal. Apr. 21, 2021) ("The Court agrees with Defendants that many of the opinions set forth in the Lopiano Report are legal conclusions that fall well outside the proper scope of expert testimony."); *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 953 (D. Minn. 2018) (concluding Lopiano inappropriately offered opinions about "'whether federal law was contravened'" and excluding Lopiano's testimony "about the legal requirements of Title IX or whether [the defendant] ha[d] complied with those requirements").

guidance. In fact, the letter states, "This *guidance* represents the Department's current thinking on this topic. It does not create or confer any rights for or on any person. This guidance does not impose any requirements beyond those required under applicable law and regulations." ECF No. 10-3 at 1 (emphasis added). Dr. Lopiano purports to evaluate the factors OCR considers when employing its "case-by-case" evaluation of whether an activity can be counted for Title IX compliance, but cherry-picks factors she deems most important. ECF No. 14-1 at 15-23.

She opines that "SFA's Cheer and Dance programs do not meet the criteria," but does not even bother to go through all the factors. *Id.* Even when factors clearly weigh in favor of the teams counting as sports, she is dismissive of them. For instance, she admits that the "Cheer Handbook states that the Cheer program would receive athletic department support and participants could receive scholarships," but concludes that "such financial support does not indicate they are varsity teams." *Id.* at 23.

But the guidance specifically evaluates "[w]hether the participants in the activity are eligible to receive athletic scholarship." ECF No. 10-3 at 2. It also takes into account "[w]hether the operating budget, support services (including academic, sports medicine and strength and conditioning support) and coaching staff are administered by the athletics department or another entity, and are provided in a manner consistent with established varsity sports." *Id.* And Director McBroom states that these are all administered by the Athletic Department consistent with other varsity sports at SFA. ECF No. 10-2 at 9-11.

Dr. Lopiano also routinely injects her personal opinions into her alleged expert analysis. For example, she acknowledges that the cheer and dance programs participate in "regional, national, and invitational competitions," but claims some of the competitions are sponsored by "sophisticated commercial entities…rather than national non-profit organizations." *Id.* at 20-21. This is irrelevant pursuant to the guidance she purports to rely on, but also demonstrates serious flaws in her logic. The

NCAA may technically be a "non-profit organization," but the Supreme Court has acknowledged that it is "a massive business," noting its million-dollar and billion-dollar broadcast contracts and revenue streams where the president earns nearly $4 million per year. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2150-51 (2021).

Dr. Lopiano also claims that "nothing [she] reviewed indicates to [her] that SFA Cheer or Dance operate like a varsity sport." ECF No. 14-1 at 21. She focuses her opinion on her belief that the teams do not participate in regular season competitive opportunities," which is *one factor* but ignores altogether the other considerations, such as "[w]hether the practice opportunities (e.g., number, length and quality) are available in a manner consistent with established varsity sports in the institution's athletics program" and "[w]hether the primary purpose of the activity is to provide athletic competition at the intercollegiate or interscholastic varsity levels rather than to support or promote other athletic activities," considering whether resources are appropriate and whether the teams are selected based on athletic ability.

In addition to Dr. Lopiano's opinions being improper legal conclusions, her testimony is also not helpful to the Court, who is perfectly capable in assessing whether cheer and dance should count as sports for Title IX purposes. Moreover, her expert opinions are clearly unreliable and therefore not relevant. belief. *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019) ("To be relevant, the expert's reasoning or methodology [must] be properly applied to the facts in issue.").

Plaintiffs offer argument concerning a three-part test that is of no moment to this Court, proffer an improper expert witness, and ignore SFA's provision of equal treatment and opportunities via the nine remaining factors contained in the 1975 Regulation. For these reasons, Plaintiffs cannot show a substantial likelihood that they will prevail on the merits, let alone a "clear entitlement to the relief under the facts and the law" for this Court to grant their request for a preliminary injunction.

### C. Plaintiffs are not entitled to a mandatory preliminary injunction because Plaintiffs fail to meet their burden of showing a clear entitlement to relief in light of *Loper-Bright* and *Kisor*.

Plaintiffs concede that they do not ask this Court to maintain the status quo. *See* ECF No. 14 at 15-16. However, Plaintiffs ask the Court to "restore the status quo," citing *Texas v. Biden*, 646 F. Supp. 3d 753, 771 (N.D. Tex. 2022) and *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). *Id.* But neither case supports such a request. *Texas v. Biden* held that Section 705 of the Administrative Procedure Act ("APA") allowed it to stay an already existing agency action, finding the status quo to be restored was the state of affairs before the contested agency action. 646 F. Supp. 3d at 771. It did not address a preliminary request for mandatory injunctive relief.

Despite *Canal Authority's* "words of caution" that "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, [] by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction," other courts within the Fifth Circuit have noted that the rule nonetheless remains that "when a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *See e.g., Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16-CV-2919-B, 2016 WL 6893629 (N.D. Tex. Nov. 21, 2016) (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971).

The Fifth Circuit's pronouncement of that rule predates its *Canal Authority* decision, and "[t]he rule in this circuit is that where two previous holdings or lines of precedent conflict the earlier opinion controls and is the binding precedent in this circuit (absent an intervening holding to the contrary by the Supreme Court or this court en banc)." *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 n.8 (5th Cir. 2006); *accord United States v. Sanchez-Pena*, 336 F.3d 431, 444 n.62 (5th Cir. 2003) ("'When faced with conflicting panel opinions, the earlier controls our decision.'" (quoting *United States v. Miro*, 29 F.3d 194, 199 n.4 (5th Cir. 1994))).

Plaintiffs may, and clearly do, disagree with the legal relevance of the three-part test, but their insinuation that SFA has made frivolous arguments to "encourage this court to abandon the three-part test that courts have applied for decades" is wrong. Courts have "applied [the three-part test] for decades" because they were required to. Two landmark Supreme Court decisions were recently rendered directly on-point to the required deference to agency's interpretations of statutes and regulations. Plaintiffs' attempts to diminish *Loper-Bright* and *Kisor* only highlight their inability to succeed on the merits of their gender discrimination claim when they cannot utilize an arbitrary and nonsensical test to do so. The current landscape of Title IX in light of the Supreme Court's decisions in *Loper-Bright* and *Kisor* necessarily means that the law does not clearly favor Plaintiffs.

### D. At this stage, Plaintiffs are not entitled to the specific relief they seek because injunctive relief must be narrowly tailored.

Plaintiffs argue "specific relief is the appropriate remedy." ECF No. 14 at 15. At this stage, however, Plaintiffs are not entitled to the specific relief they seek. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80, 137 S.Ct. 2080, 198 L.Ed.2d 643 (2017). The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580, 137 S.Ct. 2080 (citation and internal quotation marks omitted).

Here, SFA has explained that the specific relief requested by Plaintiffs—reinstating the teams—is not feasible at this point in time, given the quickly-approaching upcoming school year. This is not "a roundabout attempt to evade a preliminary injunction," as Plaintiffs suggest. It is asking this Court to recognize the impracticality of Plaintiffs' request, while acknowledging that both OCR and courts allow institutions to enter into compliance plans. Thus, the court should "mold its decree" to meet these exigent circumstances by allowing SFA to develop a compliance plan, as previously suggested in its Response, in the event it finds Plaintiffs are entitled to a preliminary injunction. *See*

ECF No. 10-0; *id.* at 580, 137 S.Ct. 2080.

                              Respectfully submitted.

                              KEN PAXTON
                              Attorney General of Texas

                              BRENT WEBSTER
                              First Assistant Attorney General

                              RALPH MOLINA
                              Deputy First Assistant Attorney General

                              AUSTIN KINGHORN
                              Deputy Attorney General for Civil Litigation

                              KIMBERLY GDULA
                              Chief for General Litigation Division

                              */s/ Marlayna M. Ellis*
                              MARLAYNA M. ELLIS
                              Assistant Attorney General
                              Texas Bar No. 24123448
                              Office of the Attorney General
                              General Litigation Division
                              P.O. Box 12548, Capitol Station
                              Austin, Texas 78711-2548
                              (512) 463-2100| FAX: (512) 320-0667
                              Marlayna.Ellis@oag.texas.gov
                              *Attorneys For Defendant*

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing document has served through the Court's Electronic Filing System on July 29, 2025, to all counsel of record:

                              */s/ Marlayna M. Ellis*
                              MARLAYNA M. ELLIS