IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| SOPHIA MYERS, KARA KAY, RYANN ALLISON, ELAINA AMADOR, BERKLEE ANDREWS, and MEAGAN LEDBETTER, Individually and on Behalf of All Others Similarly Situated, § § § § § § § | | |
| *Plaintiffs*, § § | | CIVIL ACTION NO. 9:25-CV-00187 JUDGE MICHAEL J. TRUNCALE |
| VS. § § | | |
| STEPHEN F. AUSTIN STATE UNVIERSITY, a member of THE UNIVERSITY OF TEXAS SYSTEM, § § § § § | | |
| *Defendant*. § § | | |

## ORDER GRANTING PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

Before the Court is Plaintiffs Sophia Myers, Kara Kay, Ryann Allison, Elaina Amador, Berklee Andrews, and Megan Ledbetter's *Emergency* Motion for Preliminary Injunction. [Dkt. 2]. For the following reasons, the Court **GRANTS** the motion.

### I.   BACKGROUND

Plaintiffs, female student-athletes at Stephen F. Austin State University ("SFA"), filed this class action lawsuit against SFA for alleged violations of Title IX of the Education Amendments of 1972. [Dkt. 1]. They allege that SFA discriminated against them on the basis of sex by depriving them of equal opportunities to participate in varsity intercollegiate athletics. *Id.*

On May 22, 2025, SFA announced its elimination of the varsity women's beach volleyball and bowling teams, in addition to the men's and women's golf teams. [Dkt. 2 at 5]. This belated notification left Plaintiffs scrambling to arrange alternative plans for the upcoming academic year. According to the athletes, the transfer windows for women's bowling, beach volleyball, and golf had already closed or were imminently closing after the announcement, with many alternative teams already having filled rosters and

allocated their scholarship budgets.[1] [Dkts. 2-1 at ¶ 13 (Declaration of Sophia Myers); 2-2 at ¶ 11 (Declaration of Kara Kay); 2-3 at ¶ 14 (Declaration of Ryann Allison); 2-5 at ¶ 9 (Declaration of Berklee Andrews); 2-6 at ¶ 11 (Declaration of Meagan Ledbetter)]. Many of the Plaintiffs are rising seniors who were faced with the "impractical reality" of transferring their academic credits so late in their college careers, thereby setting them back further in their education. [Dkts. 2-2 at ¶ 11; 2-3 at ¶ 14].

Finding no alternatives, Plaintiffs sought legal counsel who wrote to SFA informing the school of its Title IX allegations on June 5, 2025. [Dkt. 2 at 6–7]. Settlement negotiations fell through and SFA informed Plaintiffs it would not reinstate their teams on June 27, 2025. *Id.* at 7; [Dkt. 14 at 12]. Shortly thereafter, on June 30, 2025, Plaintiffs filed their Complaint and the Present motion. [Dkts. 1, 2]. The Court held a hearing on the motion on July 30–31, 2025.

In their motion, Plaintiffs seek an order preserving the women's beach volleyball, bowling, and golf team, in addition to all other women's varsity teams at SFA during the pendency of this case. [Dkt. 2 at 5]. In response, SFA argues that Plaintiffs' motion does not meet the substantive requirements for a preliminary injunction. [Dkt. 10].

## II.    LEGAL STANDARDS

### A. Preliminary Injunction

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (citing *Planned Parenthood of Hous. & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005)). The last two elements merge when the Government is an opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

---

[1] Some of Plaintiffs' teammates were able to transfer successfully.

"A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* (internal quotation marks and citation omitted). Nevertheless, a movant "is not required to prove [its] case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). However, when a plaintiff seeks a mandatory injunction, as here, he "bears the burden of showing a clear entitlement to the relief under the facts and the law." *Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (per curiam)).

The purpose of a preliminary injunction is "to preserve the relative positions of the parties" until the merits can be determined. *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (quoting *Camenisch*, 451 U.S. at 395); *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023), *vacated on other grounds*, 144 S. Ct. 480 (2023) (mem. op.). "The 'status quo' to be restored is 'the last peaceable uncontested status existing between the parties before the dispute developed.'" *Texas v. Biden*, 646 F. Supp. 3d 753, 771 (N.D. Tex. 2022) (quoting Charles Alan Wright & Arthur R. Miller, 11A Federal Practice & Procedure § 2948 (3d ed. 2013)). As articulated by the Fifth Circuit:

> If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties by the issuance of a mandatory injunction or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury.

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (citations omitted).

Finally, the decision of whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

### B. Title IX Framework and Relevant Analysis

Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program

or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Related to enforcement provisions, Title IX specifically "authorizes each agency awarding federal financial assistance to any education program to promulgate regulations 'ensuring that aid recipients adhere to § [1681(a)'s] mandate.'" *Pederson v. La. State Univ.*, 213 F.3d 858, 877 (5th Cir. 2000) (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 514 (1982)). As a result of the enforcement mandate, the Department of Education ("DOE") utilized its statutory authorization to promulgate regulations governing the operation of federally funded programs, including athletics. *Id.* at 877.

Of relevance to athletics programs is DOE's 1975 implementing regulation. 34 C.F.R. § 106.41. The regulation provides ten factors for an athletic director to consider whether equal opportunities in athletics are available to men and women:

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

*Id.* § 106.41(c). Notably, "violations of Title IX in the area of athletics are often divided into effective accommodation claims and equal treatment claims," where the former claim is governed by the first factor and the latter claim is governed by the subsequent nine factors.[2] *Pederson*, 213 F.3d at 865 n.4; *see also*

---

[2] SFA suggests that the Court should consider all ten factors together because "the regulatory text requires consideration of *all* ten factors" because the text does not suggest "that a weakness of one factor cannot be offset by strength in another factor." [Dkt. 10 at 12]. However, the Fifth Circuit has long recognized the division of the factors into two separate claims, and Plaintiffs bring a claim only under the accommodation portion described in § 106.41(c)(1). *Pederson*, 213 F.3d at 865 n.4. The Court finds that this distinction makes sense. In the Court's view, it would be illogical to find no Title IX violation if a school gives women unequal accommodations of their interests and abilities but treats the lesser-accommodated athletes equally. For example, assume the undergraduate population is 50/50 men-to-women, but 70% of the athletics opportunities are provided to men and only 30% of the opportunities are given to women despite the women's interests and abilities to play 50% of the sports. The mere equality in publicity, training facilities, allowances, and scheduling between men and women does not cure the fact that women are nevertheless being provided with unequal opportunities to enjoy the benefits of the school's athletics program. This directly flies in the face of Title IX's prohibition against denying women the benefits of educational activities on the basis of sex.

*Niblock v. Univ. of Ky.*, No. CV 5:19-394-KKC, 2024 WL 4891025, at *2 (E.D. Ky. Oct. 28, 2024) ("Gender discrimination claims in college athletics fall into two categories based on the § 106.41(c) factors: effective accommodation claims focus on the first factor, and equal treatment claims focus on the other nine factors."). Here, Plaintiffs allege gender discrimination in violation of Title IX under the accommodation claim, governed by 34 C.F.R. § 106.41(c)(1). *See* [Dkt. 1 at ¶ 127].

To determine whether SFA's actions complied with legal requirements, Plaintiffs argue that the Court should rely upon the Department of Education's 1979 Policy Interpretation and 1996 Policy Guidance, which articulates a three-part test for equal participation opportunities under Title IX. *See* 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979) [hereinafter "1979 Policy Interpretation"]; Office of Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test*, https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html (Jan. 16, 1996) [hereinafter "1996 Clarification Letter"]. In contrast, SFA argues that the three-part test should not apply because, pursuant to the Supreme Court's decisions in *Loper Bright* and *Kisor*, the Court should analyze the plain meaning of Title IX and the 1975 Title IX implementing regulations. *See Loper Bright v. Raimondo*, 603 U.S. 369 (2024); *Kisor v. Wilkie*, 588 U.S. 558 (2019).

       i.    ***Loper Bright* and Interpretations of Ambiguous Statutes**

A federal agency cannot act without congressional authorization. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). It cannot confer power upon itself. *Id.* "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Id.* at 374–75. Under the Supreme Court's decision in *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), for decades courts have sometimes been required "to defer to 'permissible' agency interpretations of the statutes those agencies administer—even when a reviewing court reads the statute differently." *Loper Bright*, 603 U.S. at 378.

The Supreme Court has done away with this requirement: "*Chevron* is overruled." *Id.* at 412. The Court made clear that "[c]ourts must exercise their independent judgment in deciding whether an agency

5

has acted within its statutory authority." *Id.* The exercise of such independent judgment, the Court explained, is rooted in the "solemn duty" imposed on courts under the Constitution to "say what the law is." *Id.* at 385 (first citing *United States v. Dickson*, 40 U.S. 141, 15 Pet. 141, 10 L.Ed. 689 (1841) (Story, J.); and then citing *Marbury v. Madison*, 5 U.S. 137 (1803)).

The exercise of independent judicial judgment to decide legal questions, the Court observed, is also embodied in the APA, which "directs that '[t]o the extent necessary to decision and when presented, [a] reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Loper Bright*, 603 U.S. at 391 (quoting 5 U.S.C. § 706). Likewise, under the APA, a reviewing court is required to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.* (quoting § 706(2)(A)). "The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Id.* at 391–92.

The *Loper Bright* Court recognized that a statute may authorize an agency to exercise a degree of discretion, and "some statutes 'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term." *Id.* at 394. The Court went on to instruct that, when a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395. Courts "fulfill[ ] that role by recognizing constitutional delegations, fix[ing] the boundaries of [the] delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (cleaned up). "By doing so, a court upholds the traditional conception of the judicial function that the APA adopts." *Id.*

Here, Plaintiffs argue that the *Loper Bright* decision does not apply to the present case for two reasons. First, the Supreme Court did not "call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to

6

statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 412. Plaintiffs, in part, rely upon a 2000 Fifth Circuit case that concluded that Louisiana State University violated Title IX by eliminating its softball team by applying the plain text of Title IX, the Department of Education regulations, and policy interpretation. *See Pederson*, 213 F.3d 858. In fact, *Pederson* did not rely upon *Chevron*, making the extent of *Loper Bright*'s holding inapplicable.[3] Instead, *Pederson* utilized the three-part test articulated in the 1979 Policy Interpretation to determine whether the university failed to provide female athletes equal accommodation under the first factor of 34 C.F.R. § 106.41(c)(1), a *regulation* not the statute. *Id.* at 879.

Second, Plaintiffs argue that *Chevron*—which *Loper Bright* overruled—applied to courts' deference to agency interpretations of ambiguous *statutes* not the agency's own regulations. *Chevron*, 467 U.S. at 844. SFA argues that Title IX itself is unambiguous because Plaintiffs must prove that the university excluded them from participation in, denied them the benefits of, or discriminated against them "on the basis of sex," and that they failed to demonstrate that their programs were terminated because they are women. [Dkt. 10 at 14]. SFA provides only one precedent for the proposition that Title IX is unambiguous. *Peltier v. Charter Day School, Inc.*, 37 F. 4th 104 (4th Cir. 2022). That case, however, does not apply to the present case because the issue was limited to whether a public school's sex-based dress code violates Title IX. *Id.* at 129 n.20. The Fourth Circuit found that the statute unambiguously covered these dress codes because it was not included in the list of exclusions in the statute. *Id.* Here, it is undisputed that athletic programs are covered by the statute.[4]

---

[3] SFA did not cite any Fifth Circuit cases in the sports context holding otherwise since *Loper Bright*, and the Court in its own research could not find new case law.

[4] Even if the Court were to analyze Title IX solely on the basis of the text, it finds that SFA discriminated against its female student-athletes because of their sex by failing to provide them equal opportunities to enjoy the benefits of educational activities. Although SFA argues that it cut the women's beach volleyball, bowling, and golf teams because of financial reasons, other evidence demonstrates that sex played a role in its determination. For example, Athletic Director Michael McBroom stated that the reason why they cut three women's teams and only one men's team was to remain in compliance with NCAA regulations, which require the university to sponsor sixteen teams, which can broken up into, for example, eight women's teams and six men's teams. This essentially means that gender was a consideration in his decision to cut the teams. The evidence shows that only one men's team was cut. For the Court, this is sufficient at this stage to find a likelihood of success on the merits if looking solely at the statutory text.

### ii.     *Kisor* and Interpretation of Ambiguous Regulations

SFA primarily disputes the proper interpretation of the implementing regulation, 34 C.F.R. § 106.41(c). In *Kisor v. Wilkie*, the Supreme Court made clear that an agency has "leeway" to interpret its own regulatory language if "genuinely ambiguous" and is entitled to "fill out the regulatory scheme Congress has placed under its supervision." 588 U.S. at 580. Thus, the DOE's interpretation of its own implementing regulation is entitled to deference so long as the Court's independent assessment finds the construction reasonable and not in conflict with Congressional intent. *City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005); *Enron Oil & Gas Co. v. Lujan*, 978 F.2d 212, 215 (5th Cir. 1992).[5]

In aiding the Court's interpretation, the Court relies upon out-of-circuit cases because the courts within the Fifth Circuit have not tackled this particular issue since the Supreme Court issued *Kisor*. Since *Kisor*, many courts have continued interpreting § 106.41(c) under the DOE's 1979 Policy Interpretation and/or 1996 Clarification Letter. *See Balow v. Mich. State Univ.*, 24 F.4th 1051 (6th Cir. 2022); *Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782 (8th Cir. 2021); *Portz v. St. Cloud State Univ.*, 16 F.4th 577 (8th Cir. 2021); *Allen v. Escanaba Area Pub. Schs.*, -- F. Supp. 3d --, 2025 WL 1328799 (W.D. Mich. May 6, 2025); *Soule v. Conn. Ass'n of Schools*, 755 F. Supp. 3d 172 (D. Conn. 2024); *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499 (M.D. Pa. 2022); *Lazor v. Univ. of Conn.*, 560 F. Supp. 3d 673 (D. Conn. 2021); *Schroeder v. Univ. of Or.*, 6:23-CV-01556-MC, 2025 WL 1019760 (D. Or. Apr. 4, 2025); *Anders v. Cal. State Univ., Fresno*, 1:21-cv-179-AWI-BAM, 2021 WL 1564448 (E.D. Cal. Apr. 21, 2021).

Of these cases, the only court to specifically wrestle with the *Kisor* analysis was the Eastern District of Kentucky in *Niblock v. University of Kentucky*, No. 5:19-CV-394-KKC, 2023 WL 4997678 (E.D. Ky. Aug. 4, 2023). The court concluded that the policy interpretations were entitled to deference under *Kisor* because the phrase "equal athletic opportunity" is inherently ambiguous:

---

[5] The Court finds that this analysis is consistent with the spirit of *Loper Bright*'s emphasis on separation of powers and the judiciary's role to say what the *law* is. To interject the Court's own reading of the Executive Branch's interpretations of its own regulations would exceed its limited role. *Kisor* strikes a fine balance between preserving separation of powers and checking agency power by ensuring, among other reasons, that the agency's interpretation is reasonable.

> [T]his Court finds that the regulation is in fact ambiguous. The term "equal athletic opportunity" is inherently ambiguous—so much so that the regulation then lists ten (non-exhaustive) factors that could help determine what "equal opportunity" even means. As to those factors, the terms "effectively accommodate the interests and abilities" offer further ambiguity. These are words "written at a high level of abstraction and, as a result ... ambiguous." *Chalenor*, 291 F.3d at 1047; *see also Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 795 (8th Cir. 2021) ("[The policy clarifications] represent authoritative interpretations of an ambiguous rule that are entitled to deference from the court."); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97 (2d Cir. 2012) ("[Later policy clarifications] reflect reasonable agency interpretations of ambiguities in its own regulation, and there is no reason to think that the agency's interpretations do not reflect its fair and considered judgment on the matter in question.") (cleaned up).

*Id.* at *2. Furthermore, the Eastern District of Kentucky found that the 1979 Policy Interpretation was reasonable because the university failed to cite any case law suggesting that the interpretation was unreasonable. *Id.* Similarly, here, SFA's only argument for unreasonableness was that the policy interpretations "substantial proportionality" prong essentially creates the long-term effect of a quota. [Dkt. 10 at 11]. Not only does SFA fail to cite supporting case law, the Fifth Circuit in *Pederson* rejected this argument. 213 F.3d at 878. Finally, the *Niblock* court found that the 1979 Policy Interpretation was entitled to deference because, among other reasons, (1) the interpretation is long-standing department policy, (2) Congress explicitly delegated the DOE with the responsibility of prescribing standards for athletic programs under Title IX, and (3) the Policy Interpretation does not create "unfair surprise" to educational institutions because of its flexible approach to regulation instituted after the Department found that the regulation was ambiguous. *Id.* at *2–3. The Court finds, for the same reasons articulated here, that the 1996 Clarification Letter also meets the *Kisor* requirements.

The Court agrees with *Niblock*'s comprehensive analysis and thereby adopts it in the absence of Supreme Court and Fifth Circuit precedence to the contrary. Furthermore, the Court, performing an independent assessment, finds the DOE's construction reasonable and not in conflict with Congressional intent. Accordingly, the Court will analyze Plaintiffs' Title IX claims under the guidance provided by the three-prong test articulated by the DOE.[6]

---

[6] SFA also argues that the Court should apply an Equal Protection Clause analysis to Plaintiffs' Title IX claims because Title VI—after which Title IX was modeled—employs an equal protection analysis. [Dkt. 10 at 15–19]. The Court

### III.    DISCUSSION

#### A. Likelihood of Success on the Merits

When considering likelihood of success on the merits, courts look to "standards provided by the substantive law." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016). Plaintiffs' sole cause of action arises under Title IX's effective-accommodation provision. *See* [Dkt. 1].

Under the athletic regulations, a university "shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). In determining whether equal opportunities are provided, a court must consider "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id.* § 106.41(c)(1). The 1979 Policy Interpretation put forth a three-prong test to determine whether a university effectively accommodated the interests and abilities of female athletes:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the numbers of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See* 44 Fed. Reg. at 71,418. An institution complies with Title IX if it can demonstrate any part of this three-prong test. *Pederson*, 213 F.3d at 879 ("As a matter of law, a Title IX violation 'may be shown by proof of a substantial violation in *any one* of the three major areas of investigation set out in the Policy Interpretation.'" (quoting *Roberts v. Colo. State Univ.*, 814 F. Supp. 1507, 1511 (D. Colo. 1993), *aff'd in part & rev'd in part sub nom.*, *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824 (10th Cir. 1993))).

---

declines to entertain this suggestion because SFA cites no case law suggesting that the analyses are the same and coextensive.

### i. Substantially Proportionate

The first prong requires an analysis of "[w]hether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." 44 Fed. Reg. at 71,418. Opportunities are substantially proportionate "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." 1996 Clarification Letter; *see also Balow*, 24 F.4th at 1061 ("[A] viable team is not an average one, but is instead one 'for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team.'" (quoting 1996 Clarification Letter)).

Here, Plaintiffs' expert, Dr. Donna Lopiano determined that women currently make up 63% of SFA's undergraduate population and receive only 45.6% of the athletic opportunities. [Dkt. 2-8 at 21]. According to Dr. Lopiano's calculations, SFA needs to add 223 varsity intercollegiate athletic opportunities for women to achieve proportionality. *Id.* Furthermore, "if the beach volleyball, bowling, and men's and women's golf teams are eliminated and the other facts stay the same, the female athlete participation gap will increase to 245." *Id.*[7] In fact, SFA's own 2024 Title IX Summary report prepared by Helen Grant in January 2025 stated: "SFA is not providing male and female athletics participation rates in substantial proportionality to the male and female undergraduate enrollment rates." [Dkt. 10-1 at 3].

SFA argues that the Court should not rely on Dr. Lopiano and instead rely upon Michael McBroom, the Director of Athletics at SFA, who stated that "SFA's student enrollment was 36% male and 64% female, with "555 student-athletes (286 male and 269 female)." [Dkt. 10-2 at 3]. McBroom

---

[7] SFA states that the Court should not rely on this data because the data submitted to the DOE under the Equity in Athletics Disclosure Act ("EADA") was not available at this time. Instead, Dr. Lopiano used the SFA common data set retrieved from public rosters and information for the 2024–2025 school year in her report. *See* [Dkt. 2-8 at 21]. She also did not use the data from 2023–2024 because they were very unusual and demonstrated an even greater gender gap than the data on which she relied. *Id.* at 20–21. In employing this method, Dr. Lopiano actually gave SFA the benefit of the doubt.

testified that he got those numbers from a university website link.[8] He factored in the cheer and dance teams for the first time in SFA history.[9] Although SFA presented evidence that the addition of cheer would bring it in further compliance with Title IX, the university was not counting cheer as a sport at the time they discontinued three women's teams. *See* [Dkt. 10-1 at 11 (Helen Grant's Report) ("According to the latest information from the National Federation of State High School Associations (NFHS), there are three interscholastic sports (Competitive Cheer, Swimming & Diving, and Wrestling) for girls in the state of Texas, but not on the intercollegiate level at SFA."); *id.* at 36 (table of the active sports during the 2024–2025 academic year, which excluded cheer). Thus, *at the time they cut beach volleyball, bowling, and golf*, SFA was nowhere near close to substantial compliance.

However, even using the cheer team numbers, Dr. Lopiano prepared a supplemental report in response to the addition of cheer and dance, which demonstrates a female participation gap of 71 students. [Dkt. 14-1 at 29]. SFA itself noted that the average size of a women's team is 22.4 players. [Dkt. 10 at 21]. Absent the result of a survey (*see infra* Section III.A.iii), a gap of 71 does not create a substantially proportionate opportunity because the gap is large enough to field additional viable athletic teams, including the beach volleyball team, bowling team, and golf team, which require 10, 6, and 5 players, respectively. *Id.* at 24–25. *See, e.g., Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1094–101 (S.D. Iowa 2020) (holding that the estimated participation gap of 47 before teams were cut was sufficient to show likelihood of success on the merits of the plaintiffs' Title IX claim for inequitable participation opportunities); *Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 111–12 (D. Conn. 2010) (finding the university out of compliance with a participation gap of 38 women), *aff'd*, 691 F.3d 85 (2d Cir. 2012).

Accordingly, the Court finds Plaintiffs present a likelihood of success on the merits that SFA is not incompliance with the first prong of the three-part test.

---

[8] In the Court's review of this link, it could not find the athletics ratio numbers utilized by McBroom.

[9] One of the primary arguments between the parties at the hearing and in their briefing is whether cheer and dance should be considered "sports" for purposes of the Title IX evaluation. At this stage, the Court does not find that determination relevant because SFA did not consider cheer a varsity athletic at the time they cut the women's beach volleyball, bowling, and golf teams.

### ii.  History and Continuing Practice of Program Expansion

Here, SFA failed to brief its compliance on this prong. Therefore, the Court finds that it conceded its failure to meet this test, and it will not address it further. *See United States v. Martinez,* 263 F.3d 436, 438 (5th Cir. 2001) ("Generally speaking, a defendant waives an issue if he fails to adequately brief it."); *see also* E.D. Tex. Local R. CV-7(c) ("The briefing shall contain a concise statement of the reasons in support of the motion and citation of authorities upon which the movant relies.").

### iii.  Effective Accommodation of Interests and Abilities

Finally, the Court must determine "whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program." 44 Fed. Reg. at 71,418. In determining compliance with this prong, the DOE considers three questions: (1) whether there is unmet interest in a particular sport; (2) whether there is sufficient ability to sustain a team in the sport; and (3) whether there is a reasonable expectation of competition for the team. 1996 Clarification letter; *see also S.A. v. Sioux Falls Sch. Dist.*, No. 4:23-CV-04139, 2023 WL 6794207, at *10 (D.S.D. Oct. 13, 2023). Courts and universities consider several factors like whether an institution uses nondiscriminatory methods of assessment when determining the athletic interests and abilities of its students; whether a viable team for the underrepresented sex recently was eliminated; multiple indicators of interest; multiple indicators of ability; and frequency of conducting assessments. 1996 Clarification Letter. When a university has recently eliminated a viable team for the underrepresented sex, there is a "presumption that the institution is not in compliance with Prong Three that the institution can rebut through strong evidence that interest, ability, or competition no longer exists." See *Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834, 858 (D. Minn. 2019), *aff'd in part, vac'd in part, rev'd in part on other grounds*, 16 F.4th 577 (8th Cir. 2021); *see also* 1996 Clarification Letter.

Here, SFA attempts to rebut this presumption by demonstrating that (1) only 38 NCAA Division 1 universities like SFA sponsor bowling; (2) bowling "is also not sufficiently popular in Texas, as is not considered a UIL sport in Texas; (3) the bowling team must travel across the country to compete because

13

there is a lack of local competition; and (4) only 12 beach volleyball teams are in the Midsouth Region that serves SFA. [Dkt. 10 at 22–23]. None of this evidence to rebut the presumption negates the interest *of the SFA student body or admitted students* or that the university attempted to assess their students or prospective students about the viability of these programs. This is also supported by their Title IX compliance report that states: "SFA could argue compliance with Test 3 with the current sports offerings. However, that may be difficult to confirm without conducting an Interest Survey." [Dkt. 10-1 at 4]. SFA has not conducted an interest survey of its undergraduate population or admitted students. Finally, Athletic Director Michael McBroom admitted that SFA does not satisfy this prong because the school had an interest and ability to field the women's beach volleyball, bowling, and golf teams.

Accordingly, the Court finds that Plaintiffs demonstrated a likelihood of success that SFA is not in compliance with Title IX on the third prong.

### B. Irreparable Injury

Irreparable harm requires a showing that (1) the harm to the plaintiff is imminent, (2) the injury would be irreparable, and (3) that the plaintiff has no other adequate legal remedy. *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). "[W]hen a civil rights statute is violated, 'irreparable injury should be presumed from the very fact that the statute has been violated.'" *E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987) (citing *United States ex rel. Mitchell v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969)); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("[W]here a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation.").

"In general, courts have found that the elimination of a women's team creates irreparable harm when the plaintiffs have demonstrated a strong likelihood of success on the merits of their Title IX claim." *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018) (citing *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009); *Cohen v. Brown Univ.*, 809 F. Supp. 978 (D.R.I. 1992), *aff'd*, 991 F.2d 888 (1st Cir. 1993); *Favia v. Ind. Univ. of Penn.*, 812 F. Supp. 578 (W.D. Pa. 1993), *aff'd*, 7 F.3d

14

332 (3d Cir. 1993); *Choike v. Slippery Rock Univ.*, Civil Action No. 06-622, 2006 WL 2060576 (W.D. Pa. July 21, 2006); *Barrett v. W. Chester Univ. of Penn.*, No. Civ.A. 03- CV-4978, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003)).

Dr. Lopiano believes that it could take three to four years for the university to reinstate competitive teams if they are not immediately reinstated. [Dkt. 2-8 at 28–30]. She also indicated that academic harm may occur to transfer students because the transferee universities may not take all the credits SFA offers, thereby prolonging the women's education timelines. *Id.* at 30. There also may be financial harm where the athletes who transfer cannot get athletic aid. *Id.* at 31. Furthermore, Plaintiffs stated that their transfer prospects diminished, if not already foreclosed, by the time SFA eliminated their teams, thereby depriving them of an opportunity to continue playing a sport to which they dedicated years of hard work. [Dkts. 2-1 at ¶ 13; 2-3 at ¶ 14; 2-4 at ¶ 9; 2-5 at ¶ 9]. At least one of the Plaintiffs are rising seniors who were faced with the "impractical reality" of transferring their academic credits so late in their college careers, thereby setting them back further in their education. [Dkts. 2-2 at ¶ 11; 2-3 at ¶ 14].

SFA argues that Plaintiffs do not suffer from irreparable injury because their harm "is both speculative and self-inflicted." [Dkt. 10 at 25]. This callous assertion stems from its claim that Plaintiffs delayed in filing the suit and from the fact that some of their teammates already transferred. *Id.* at 24. First, the Court does not find that Plaintiffs delayed in filing their lawsuit. On May 22, 2025, SFA announced its elimination of the varsity women's beach volleyball and bowling teams, in addition to the men's and women's golf teams. [Dkt. 2 at 5]. Plaintiffs sought legal counsel who wrote to SFA informing the school of its Title IX allegations on June 5, 2025, two weeks later. *Id.* at 6–7. Settlement negotiations fell through and SFA informed Plaintiffs it would not reinstate their teams on June 27, 2025. *Id.* at 7; [Dkt. 14 at 12]. Shortly thereafter, on June 30, 2025, Plaintiffs filed their Complaint and the Present motion. [Dkts. 1, 2]. Nor can the Court say their injury was "self-inflicted" when the athletes were forced to make an impossible decision between remaining at SFA with no opportunity to play their sport or to transfer and potentially prolong their academic careers and not receive the same financial compensation.

15

For these reasons, the Court finds that Plaintiffs demonstrated a substantial threat of irreparable harm.

### C. Balance of Hardships and Public Interest

Finally, a court must weigh "the competing claims of injury" and considers "the effect on each party of the granting or withholding of the requested relief," paying close attention to the public consequences of granting an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312 (citing *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

SFA argues that reinstatement of the women's bowling, beach volleyball, and golf teams would result in approximately $1 million in financial expenses annually. [Dkt. 10 at 27]. However, it failed to articulate *how* that burden overweighs the irreparable harm Plaintiffs will suffer without the injunction. *Id.* Gina Oglesbee, Senior Vice President for Organizational Effectiveness at SFA, testified that athletics has approximately a $20 million budget and that the school has a budget deficit. She admitted, however, that the university's cash reserve is not on the verge of collapse. Additionally, as noted by Plaintiffs, the financial harm that SFA claimed caused its elimination of the women's teams were exacerbated by its voluntary decision to opt into a settlement that contained a revenue-sharing model that permits the school to share up to $20.5 million with its athletes. [Dkts. 10-2 at 3; 2-1 at Ex. A]. Testimony from the student athletes and coaches represented a strong belief that their teams could be fielded if the Court instated an injunction. Based on this evidence, the Court finds that the financial burden self-imposed by SFA does not outweigh the harm suffered by Plaintiffs. Therefore, the Court finds that Plaintiffs satisfied their burden for issuance of a preliminary injunction.[10]

---

[10] SFA asks the Court that, in the event it finds injunctive relief is warranted, it should afford SFA an opportunity to create a plan to demonstrate compliance. [Dkt. 10 at 28–29]. The Court declines to provide SFA with this opportunity, especially considering it had the chance to become compliant with Title IX in January when it received the report indicating it was

## IV.   CONCLUSION

It is therefore **ORDERED** that Plaintiffs' *Emergency* Motion for Preliminary Injunction [Dkt. 2] is hereby **GRANTED**.

It is further **ORDERED** that Defendant Stephen F. Austin State University preserve the women's beach volleyball team, women's bowling team, women's golf team, and all other women's varsity teams at the University while this case is pending.

**SIGNED this 1st day of August, 2025.**

Michael J. Truncale
United States District Judge

---

not in compliance with the statute. [Dkt. 10-1]. Instead of seeking compliance, it cut three women's programs. This does not demonstrate any desire to be compliant. Therefore, injunctive relief is proper.