**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| **SOPHIA MYERS, KARA KAY, RYANN ALLISON, ELAINA AMADOR, BERKLEE ANDREWS, MEAGAN LEDBETTER, and TARYN CLAYTON, individually and on behalf of all others similarly situated,** | § § § § § § § | **CASE NO. 9-25-cv-00187-MJT** |
| **Plaintiffs,** | § § | |
| **v.** | § § § | **CLASS ACTION COMPLAINT** |
| **STEPHEN F. AUSTIN STATE UNIVERSITY; a member of THE UNIVERSITY OF TEXAS SYSTEM,** | § § § | |
| **Defendant.** | | |

<u>**FIRST AMENDED COMPLAINT**</u>

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

    **Plaintiff Kara Kay** ................................................................................................ 5

    **Plaintiff Ryann Allison** ........................................................................................ 6

    **Plaintiff Elaina Amador** ...................................................................................... 6

    **Plaintiff Berklee Andrews** ................................................................................... 7

    **Plaintiff Meagan Ledbetter** ................................................................................ 8

    **Plaintiff Taryn Clayton** ....................................................................................... 9

    **Defendant SFA** ..................................................................................................... 9

FACTUAL ALLEGATIONS ......................................................................................... 10

    **The Women's Teams** ........................................................................................... 10

    **The Elimination of the Women's Beach Volleyball, Bowling, and Golf Teams** ............... 11

    **Title IX Bars SFA From Discriminating Against Its Female Athletes Based on Their Sex** ................................................................................................................... 13

    **SFA is Discriminating Against Its Female Athletes Based on Their Sex** ........................... 14

CLASS ALLEGATIONS ............................................................................................... 22

COUNT I ........................................................................................................................ 25

    **Title IX** ................................................................................................................ 25

    **Unequal Allocation of Athletic Participation Opportunities (By the Plaintiffs and Plaintiff Class)** ............................................................................................... 25

PRAYER FOR RELIEF ................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92-93 (2d Cir. 2012).................................................. 14

*Cohen v. Brown Univ.*, 991 F.2d 888, 898 (1st Cir. 1993) ........................................................... 14

*Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 102-05 (4th Cir. 2011) ........................ 14

*Favia v. Indiana Univ. of Penn.*, 7 F.3d 332, 336 n. 5 (3d Cir. 1993)......................................... 14

*Homer v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994).................................. 14

*In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW (N.D. Cal. May 7, 2025) ........... 12

*Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 968 (9th Cir. 2010).............................. 15

*Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 767-68 (9th Cir. 1999) ................... 14

*Pederson v. Louisiana State Univ.*, 213 F.3d 858, 879 (5th Cir. 2000)........................................ 14

*Portz v. St. Cloud State Univ.*, 16 F. 4th 577, 581 (8th Cir. 2021) .............................................. 14

*Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993).................................. 14

**Statutes**

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq............................ 3, 10

**Other Authorities**

34 C.F.R. § 106.41(c).................................................................................................................... 13

34 C.F.R. Part 106........................................................................................................... 2, 10, 26

Office of Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996).......................................................................... 2

Policy Interpretation, Section VII.C.5.a., 44 Fed. Reg. 71,418 (1979) .............................. 2, 13, 14

*SFA Announces Sports Sponsorship Changes*, Stephen F. Austin (May 22, 2025, 4:14 PM), https://sfajacks.com/news/2025/5/22/untitled-story................................................................ 11

## INTRODUCTION

1.     Plaintiffs, female student-athletes at Stephen F. Austin State University ("SFA"), bring this class action lawsuit against SFA for discriminating against its female student-athletes and potential student-athletes on the basis of their sex in violation of Title IX of the Education Amendments of 1972 ("Title IX"), by depriving them of equal opportunities to participate in varsity intercollegiate athletics—and announcing its elimination of the varsity women's beach volleyball, bowling, and golf teams (along with the men's golf team).

2.     The announcement was stunning. In the early morning of May 22, 2025, shortly after the conclusion of the semester, Plaintiffs and the other affected athletes were notified of mandatory team meetings with SFA administrators to be held that same day.  At the Zoom meeting for the team, which lasted approximately ten minutes each, Plaintiffs and the other affected athletes were told that SFA was eliminating their sports effective immediately. The school cited budgetary concerns.

3.     The decision to eliminate the women's programs was consistent with SFA's history of sex discrimination in its intercollegiate athletic program.  However, the termination of these programs came as a complete surprise to the women on the team and their coaches.

4.     Throughout its history, SFA has failed to provide equal intercollegiate athletic participation opportunities to its female students.  As just one glaring example, according to the Equity in Athletics Disclosure Act data for 2022-23, which SFA verified as accurate to the U.S. Department of Education, women were 62.8% of SFA's undergraduate population but received only 34.8% of the opportunities to participate in varsity sports.

5.      SFA's decision to cut three women's teams from its program significantly increased and exacerbated its violation of Title IX.

1

6. SFA's actions have caused harm to Plaintiffs, and to those similarly situated, and constitute intentional, prohibited discrimination based on sex in violation of Title IX and its implementing regulation at 34 C.F.R. Part 106, which applies to universities—like SFA—that receive federal funding.

7. Title IX requires educational institutions receiving federal funds to provide men and women with (a) equal opportunities to participate, (b) equal athletic financial aid, and (c) equal treatment in their intercollegiate athletic programs. SFA receives substantial federal funding, but fails to provide the required equality to women.

8. Specifically, SFA does not provide women with equal opportunities to participate in varsity intercollegiate athletics.

9. SFA fails to satisfy any of the following measures of compliance with Title IX's mandate to provide equal opportunities to participate to its female student-athletes:

    a. SFA fails to provide female student-athletes with athletic opportunities at a rate that is "substantially proportionate" to their undergraduate full-time enrollment rate;

    b. SFA fails to demonstrate a "history and continuing practice of program expansion responsive to the developing interests and abilities" of the sex that has been "historically underrepresented" (i.e., women); and

    c. SFA fails to show that "the interests and abilities" of the historically underrepresented sex have been "fully and effectively accommodated."

Policy Interpretation, Section VII.C.5.a., 44 Fed. Reg. 71,418 (1979) (emphases added); *see also* Office of Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996).

10.    The elimination of the women's beach volleyball, bowling, and golf teams continued and exacerbated SFA's failure to provide women with equal participation opportunities in violation of Title IX.

11.    Prior to filing this lawsuit, Plaintiffs' counsel sent SFA a letter raising concerns about the elimination of the women's teams, explaining why the elimination of the teams violates Title IX, and asking SFA to agree to continue women's beach volleyball, bowling, and golf and develop a plan to comply with Title IX.  Though brief negotiations ensued, SFA would not agree to reinstate all three teams or come into compliance with Title IX, forcing Plaintiffs to file this case.

12.    Through this lawsuit, Plaintiffs seek to block SFA's latest efforts to discriminate against women in its intercollegiate athletic program and require the school to comply with federal law.

13.    Specifically, Plaintiffs seek to prohibit SFA from eliminating its women's beach volleyball, bowling, and golf teams—and all other women's teams—unless and until SFA is and will be providing women with the equal opportunities to participate in varsity intercollegiate athletics that Title IX requires.[1]

## JURISDICTION AND VENUE

14.    This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., and the regulations and policies promulgated pursuant to that law.

---

[1] On August 1, 2025, this Court granted Plaintiffs' Motion for Preliminary Injunction and ordered SFA to reinstate the women's beach volleyball, bowling, and golf teams. SFA subsequently appealed, and the Fifth Circuit granted SFA's Motion to Stay the Injunction Pending Appeal. Nonetheless, SFA has represented to Plaintiffs that it intends to voluntarily reinstate the women's beach volleyball and women's golf teams, but not the women's bowling team.

15.    This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

16.    Declaratory and other relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 to obtain the correct interpretation of the legal requirements described in this Complaint, which is necessary and appropriate to determine the parties' respective rights and duties.

17.    Venue is proper in the United States District Court for the Eastern District of Texas, Lufkin Division, pursuant to 28 U.S.C. § 1391(b) because the school and programs at issue are found therein and the events giving rise to this Compliant occurred in Nacogdoches, Texas, which is within the Court's jurisdiction.

## THE PARTIES

### Plaintiff Sophia Myers

18.    Plaintiff Sophia Myers will be a senior at SFA majoring in chemistry and biology. She will graduate in 2026 and has one year of athletic eligibility remaining.

19.    Ms. Myers is a member of the SFA beach volleyball team. She joined the team as a walk-on after a successful high school career playing both beach volleyball and indoor volleyball.

20.    Ms. Myers began playing beach volleyball at the age of nine years old.  What began as a simple interest became a passion that led her to what she believed was a special college experience. Volleyball has given her confidence, unforgettable competitive experiences, and a sense of purpose.

21.    Ms. Myers chose SFA because of its beach volleyball program, and specifically the connection she felt with the girls on the team, the impressive coaches, and the energy of the school. She was also drawn to the school's science program, which allowed her to develop academically towards her dream of attending medical school.

4

22.    As a part of the SFA intercollegiate athletic program, Ms. Myers earned Southland Conference All-Academic Team honors and played on the most successful beach volleyball team in school history.

23.    The loss of the volleyball program has had an immense impact on Ms. Myers.  In a moment's notice, she lost a part of her identity, her support system, and her ability to pursue her dream of competitive beach volleyball, which gave her a unique outlet to manage stress and develop as a young adult on the path to her life goals.

24.    As an incoming senior with aspirations of attending medical school, Ms. Myers has made the impossible decision to stay at SFA for her final year. She will be deprived of her final season of competition unless the beach volleyball team is preserved.

**Plaintiff Kara Kay**

25.    Kara Kay is an incoming senior from New Braunfels, Texas, who is majoring in business economics.  She is expected to graduate in Fall 2025 and has two years of athletic eligibility remaining.

26.    Ms. Kay is a member of SFA's women's bowling team, which is the only program at SFA that has won an NCAA Division I Championship. She currently has both academic and athletic scholarships.

27.    Ms. Kay has committed a large part of her life to her sport.  She dedicates her training and competition to her mother whom she lost to cancer when she was in high school.

28.    As a senior, transferring is not an option for Ms. Kay, as many of SFA's credit hours will not transfer to other schools.  Under SFA's currently planned cuts to her program in 2025-26, she will be deprived of her final season of competition.

**Plaintiff Ryann Allison**

29.    Ryann Allison is an incoming redshirt junior from Austin, Texas, who is majoring in chemistry and biology with plans to attend medical school after she graduates in 2027.

30.    Ms. Allison is a member of the SFA beach volleyball team.  She has two years of athletic eligibility remaining.

31.    Beach volleyball has been an integral part of Ms. Allison's life. It has taught her perseverance, overcoming adversity, time management, and teamwork.

32.    Ms. Allison transferred to SFA from the University of North Carolina Asheville after her freshman year. She chose SFA because her family was nearby, the coaches treated the team well, and it felt like home.

33.    SFA's decision to discontinue the beach volleyball program has caused Ms. Allison to lose valuable friendships, relationships, and the immense joy she felt while playing her sport.

34.    Ms. Allison has decided that she cannot transfer to a new university because doing so would impede her academic progress and aspirations of attending medical school.  As such, Ms. Allison has made the impossible decision to give up beach volleyball if the women's team is not preserved.

**Plaintiff Elaina Amador**

35.    Elaina Amador will be a senior at SFA majoring in marketing and is a member of the beach volleyball team.  She expects to graduate in 2026 and has one year of athletic eligibility remaining.

36.    Ms. Amador is from Flower Mound, Texas.  She has been playing volleyball since she was eleven years old and the sport is invaluable to her.  Because of her passion for the sport and hard work, Ms. Amador earned an athletic scholarship to play at SFA.

37.     Ms. Amador was named to the All-Southland Conference Second Team and has earned Southland Conference Pair of the Week honors.  During her time at SFA, the beach volleyball team has achieved its best win record in program history.

38.     SFA's elimination of the beach volleyball program has caused Ms. Amador considerable sadness, frustration, and anxiety.  She is devastated by the loss of her sport and feels this decision is yet another example of SFA treating the women's beach volleyball program as sub-par to its other sports.

39.     SFA has taken away Ms. Amador's opportunity to finish her collegiate career as a Division I athlete.  She does not have any meaningful opportunities to transfer to another school at this date and, unless the beach volleyball team is reinstated, will be deprived of her final season of competition.

**Plaintiff Berklee Andrews**

40.     Berklee Andrews is an incoming senior from Seguin, Texas. She is majoring in business and expects to graduate in 2026.

41.     Ms. Andrews is a member of SFA's beach volleyball team. She has one year of athletic eligibility remaining.

42.     Ms. Andrews has played volleyball her entire life. Originally beginning her college career at a junior college, Ms. Andrews later transferred to SFA thinking she would complete the remainder of her college career there.

43.     Ms. Andrews was born without her left hand. When she joined SFA's beach volleyball team, she became the first ever Division I adaptive beach volleyball player. She has aspirations of playing beach volleyball at the Paralympics.

44.    SFA's decision to eliminate the beach volleyball program prior to Ms. Andrews' senior year devastated her. Like her teammates, Ms. Andrews was disadvantaged by SFA's untimely announcement of the program cuts, which impeded her ability to transfer to another school to complete her senior year. As a result, Ms. Andrews will be deprived of her final season of competition if the beach volleyball team is not preserved.

### Plaintiff Meagan Ledbetter

45.    Meagan Ledbetter is an incoming senior at SFA majoring in public health with a minor in kinesiology. She is a member of the women's beach volleyball team and has two years of beach volleyball eligibility remaining.

46.    Ms. Ledbetter came to SFA after completing two years of community college at Weatherford College, where she played indoor volleyball. She chose SFA because it gave her the opportunity to play Division I beach volleyball.

47.    Ms. Ledbetter earned an athletic scholarship as a result of her hard work and dedication.  During her time at SFA, the beach volleyball program has drastically improved its conference ranking.

48.    SFA's decision to discontinue the beach volleyball has harmed Ms. Ledbetter. She is coping with the loss of her sport, the ability to compete at the highest level, and the friendships and teammates she has lost as a result of SFA's elimination of the team.

49.    Like her teammates, Ms. Ledbetter faced the impossible decision of whether to transfer to a new university again, or give up her sport if the women's beach volleyball team is not preserved. Ms. Ledbetter has decided to stay at SFA to complete her academic career.

**Plaintiff Taryn Clayton**

50.     Taryn Clayton is from Canton, Texas, and just began her second year at SFA. Academically, Ms. Clayton is entering her junior year and she expects to graduate in 2027. She is majoring in general business with minors in legal studies and political science. She plans to attend law school after she graduates.

51.     Ms. Clayton is a member of the women's golf team at SFA. She has three years of athletic eligibility remaining.

52.     Ms. Clayton chose SFA because both of her parents are SFA alumni, and she valued the family environment that the golf coaches created.

53.     As a result of her hard work and athletic success, SFA offered Ms. Clayton an athletic scholarship to play Division I women's golf. SFA also offered her the chance to continue playing golf while obtaining her Master's degree.

54.     SFA's decision to eliminate the women's golf team caused Ms. Clayton significant harm. Ms. Clayton entered the transfer portal immediately after SFA announced the elimination of the women's golf team, but she was unable to find a comparable Division I institution with available roster spots.

55.     With the loss of her sport, Ms. Clayton was forced to choose between leaving her family, friends, and home at SFA to transfer, or staying at SFA and losing golf, which has been invaluable to her growth as an athlete, student, and person.

**Defendant SFA**

56.     Defendant SFA is a member of the University of Texas System. It is a public educational institution created by the State of Texas under the control and management of the Board of Regents of the University of Texas System.

57.    Defendant SFA is a recipient of federal funds and is required to comply with Title IX and its implementing regulations.

## FACTUAL ALLEGATIONS
### The Women's Teams

58.    SFA is an NCAA Division I institution and member of the Southland Conference. The bowling team competes in Conference USA.

59.    Prior to its elimination, the women's beach volleyball team was comprised of twenty-one student-athletes who competed in thirty-six regular season matches in 2024-25.  The Southland Conference named seventeen of SFA's twenty-one athletes to the Commissioner's Honor Roll three weeks after the team was cut.

60.    Prior to its elimination, the women's bowling team was comprised of eleven student-athletes who competed in eleven competitions, including the NCAA Arlington Regional, where it finished second.  The highly successful "Ladyjacks" finished their season ranked ninth in the nation.

61.    Prior to its elimination, the women's golf team at SFA was comprised of eight student-athletes who competed in nine regular season tournaments, as well as the Southland Conference Championship.  The Southland Conference named seven of SFA's eight golf athletes to the Commissioner's Honor Roll three weeks after the program was cut.

62.    SFA holds itself out as a university committed to providing top-quality intercollegiate sports programs. The university uses this distinction as part of its efforts to recruit top student-athletes, including Plaintiffs.

63.    Under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and the regulations adopted pursuant to 34 C.F.R. Part 106, SFA must provide equality of

opportunity for women and men in every program it offers, including equal opportunities for male and female athletes to participate in varsity intercollegiate athletics.

### The Elimination of the Women's Beach Volleyball, Bowling, and Golf Teams

64.     On the morning of May 22, 2025, SFA's Associate Athletic Director for Compliance, Nick Carroll, sent members of the women's beach volleyball, women's bowling, and men's and women's golf teams messages via the app "Teamworks," which SFA uses for its athletic programs, notifying the teams of mandatory Zoom calls scheduled for that same day.

65.     On those calls, Michael McBroom, SFA's Director of Athletics, announced that SFA was eliminating the women's beach volleyball, women's bowling, and men's and women's golf teams effective immediately.  The decision had clearly been made well in advance of the call, but no one on the coaching staff or team was given any prior indication that the beach volleyball, bowling, and golf teams would be cut.  Mr. McBroom indicated that the decision was made for financial reasons.

66.     That same day, SFA publicly announced the elimination of the women's beach volleyball, women's bowling, and men's and women's golf teams in a press release on its website. *See SFA Announces Sports Sponsorship Changes*, Stephen F. Austin (May 22, 2025, 4:14 PM), https://sfajacks.com/news/2025/5/22/untitled-story.

67.     In its press release, SFA stated the decision to eliminate the teams "was based on sustained budget deficits and the anticipated financial impact of upcoming revenue-sharing requirements with Division I athletes. . . . SFA joins a growing number of institutions across the country that have decided to discontinue athletic teams, citing the financial pressures tied to the

changing college athletics landscape, including the looming $2.8 billion in the House v. NCAA settlement."[2] *Id.*

68.    Plaintiffs were devastated by the announcement.  Many of them had come to Nacogdoches primarily because of the offer to play their sport and had already been preparing themselves for summer workouts, fall classes, and the 2025-26 season.

69.    Even worse, the NCAA transfer portal for bowling had closed less than a week earlier, and the transfer windows for the other sports would close within the next couple weeks. Though NCAA rules permit Plaintiffs to transfer outside of the transfer window due to the elimination of their programs, most teams at other schools had already set their full rosters and allocated their scholarships for the Fall of 2025.

70.    SFA's intentional delay in announcing its decision to terminate the women's teams deprived Plaintiffs not only of their sport at SFA, but of any effective opportunity to transfer to other schools.

71.    By keeping its plans a secret, SFA also denied Plaintiffs any opportunity to plan for, protect themselves against, or mitigate the sudden and devastating impacts that the decision to terminate the women's teams would have on Plaintiffs' lives, sports careers, and futures.

72.    The impact of SFA's decision has been immediate and detrimental to the student-athletes and to the coaches and staff members working with the team.

73.    The elimination of the women's teams was not only surprising and devastating to the athletes on those teams, but it was also a clear violation of federal law.

---

[2] Notably, while all Division I schools will contribute to the past damages in the *House v. NCAA* settlement, they are not required to participate in the settlement's revenue-sharing plan. Instead, schools that intend to share revenue with their athletes must opt in. *See In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW (N.D. Cal. May 7, 2025).

**<u>Title IX Bars SFA From Discriminating Against Its Female Athletes Based on Their Sex</u>**

74.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

75.     Applying Title IX to intercollegiate athletics, the Department of Education ("DOE") has adopted regulations requiring educational institutions receiving federal funds to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). These regulations are enforced by the Office for Civil Rights ("OCR").

76.     In 1979, OCR issued a policy interpretation of Title IX and the regulations as applied to intercollegiate athletics at 44 Fed. Reg. at 71418 (the "OCR Policy Interpretation").

77.     The OCR Policy Interpretation sets forth three areas of compliance under Title IX as it relates to college sports: (1) effective accommodation of student interests and abilities; (2) equal athletic financial assistance; and (3) equal treatment and benefits for athletic teams.

78.     The three areas of compliance are separate and independent. Schools can be held liable for violating Title IX in one or more of these areas. Compliance in one area cannot overcome noncompliance in another area.

79.     Violation of the equality requirements of Title IX in intercollegiate athletics constitutes intentional sex discrimination.

80.     The OCR Policy Interpretation established three different ways (the "three-part test") to measure whether SFA effectively accommodates female athletes' interests and abilities—commonly referred to as providing equal athletic participation opportunities.

81.    SFA must meet at least one of the prongs in the three-part test to comply with Title IX:

(1)    Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2)    Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3)    Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71,413 at 71,418 (1979).

82.    Every federal court of appeals that has considered the three-part test's validity—including the Fifth Circuit—has upheld it. *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 879 (5th Cir. 2000); *Portz v. St. Cloud State Univ.*, 16 F. 4th 577, 581 (8th Cir. 2021); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92-93 (2d Cir. 2012); *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 102-05 (4th Cir. 2011); *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 767-68 (9th Cir. 1999); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993); *Cohen v. Brown Univ.*, 991 F.2d 888, 898 (1st Cir. 1993); *Favia v. Indiana Univ. of Penn.*, 7 F.3d 332, 336 n. 5 (3d Cir. 1993).

### SFA is Discriminating Against Its Female Athletes Based on Their Sex

83.    SFA has discriminated and is discriminating against its female students and varsity student-athletes by depriving them of equal opportunities to participate in Title IX.

14

84.    SFA has not and cannot comply with any part of the three-part test for participation. Accordingly, it does not effectively accommodate female student-athletes' interests and abilities.

85.    First, SFA does not satisfy the first part of the test. It does not provide "intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to their respective enrollments."

86.    According to the most recent and reliable data that SFA submitted to the DOE for the 2022-23 academic year,[3] SFA has an undergraduate female population of 63.3%, yet women make up only 46.7% of the athletic opportunities. Based on this data, SFA would have to add 206 athletic opportunities for women to become substantially proportionate under Title IX.

87.    Similarly, based on SFA's 2024-25 Common Data Set and publicly available roster data for the 2024-25 academic year, women are 63% of the undergraduate population, but only 45.6% of the athletic opportunities. Based on this data, SFA would have to add 223 athletic opportunities for women to become substantially proportionate under Title IX.[4]

88.    At the time their elimination was announced, the women's beach volleyball, bowling, and golf teams provided forty participation opportunities for female athletes. The elimination of these three teams increased SFA's 2024-25 female participation gap from 223 to 245.

---

[3] The 2023-24 EADA data shows a massive increase in SFA's denial of equal opportunities, resulting in an increase of the female participation gap from 206 to 458. Even though SFA verified the accuracy of the data to the federal government, Plaintiffs question its reliability.

[4] SFA has exclusive access to its Title IX athletic participation data and has not yet disclosed that information to Plaintiffs or the public. For that reason, Plaintiffs rely in this Complaint on public EADA data that SFA has certified as accurate to the U.S. Department of Education, which courts have held is appropriate. *See, e.g.*, *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 968 (9th Cir. 2010) (finding that "EADA reports contain[ed] ample data demonstrating that [the educational institution] could not satisfy the substantial proportionality option"). Additionally, because SFA does not have to submit its 2024-25 EADA report until December 2025, Plaintiffs have retained an expert to review SFA's Common Data Set and publicly available roster information for the 2024-25 academic year.

89.     SFA will not be providing women with intercollegiate level participation opportunities in numbers substantially proportionate to their enrollment in 2025-26.

90.     Beginning on July 31, 2025, SFA will be subject to new NCAA "roster limits" for each of its sports.

91.     If SFA provides the maximum roster spots for each of its teams, SFA will be providing 261 participation opportunities to men and 231 participation opportunities to women in 2025-26. If its male and female undergraduate enrollment rates do not change, SFA would have to offer 213 more participation opportunities to women to reach substantial proportionality.[5]

92.     SFA has not announced any plans to add participation opportunities for women or decrease participation opportunities for men that will allow it to reach substantial proportionality in the 2025-26 academic year.

93.     Since at least 2003, SFA has not provided intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to their respective enrollments. The table below shows SFA's annual numbers, based on the EADA reports, except for 2024-25 and 2025-26 because EADA reports for those years are not reported yet.

---

[5] This number includes the women's beach volleyball and women's golf teams, which SFA has indicated it will voluntarily reinstate notwithstanding the stay of the preliminary injunction. It does not include women's bowling or men's golf, which have been effectively eliminated.

| Survey Year | Male Full-Time Undergraduates | Female Full-Time Undergraduates | Total Full-Time Undergraduates | Percent Full-Time Male Under Grads | Percent Full-Time Female Under Grads | Male Athletes | Female Athletes | Total Athletes | Percent Male Athletes | Percent Female Athletes | Difference from % Undergrad Females | Female Athlete Particip. Gap |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003-04 | 3442 | 4964 | 8406 | 40.9% | 59.1% | 211 | 161 | 372 | 56.7% | 43.3% | 15.8% | 143 |
| 2004-05 | 3375 | 4944 | 8319 | 40.6% | 59.4% | 184 | 115 | 299 | 61.5% | 38.5% | 21.0% | 155 |
| 2005-06 | 3447 | 5076 | 8523 | 40.4% | 59.6% | 216 | 148 | 364 | 59.3% | 40.7% | 18.9% | 170 |
| 2006-07 | 4098 | 6060 | 10158 | 40.3% | 59.7% | 227 | 143 | 370 | 61.4% | 38.6% | 21.0% | 193 |
| 2007-08 | 4099 | 6007 | 10106 | 40.6% | 59.4% | 270 | 193 | 463 | 58.3% | 41.7% | 17.8% | 203 |
| 2008-09 | 3633 | 5447 | 9080 | 40.0% | 60.0% | 235 | 181 | 416 | 56.5% | 43.5% | 16.5% | 171 |
| 2009-10 | 3769 | 5929 | 9698 | 38.9% | 61.1% | 253 | 194 | 447 | 56.6% | 43.4% | 17.7% | 204 |
| 2010-11 | 3671 | 5934 | 9605 | 38.2% | 61.8% | 222 | 226 | 448 | 49.6% | 50.4% | 11.3% | 133 |
| 2011-12 | 3570 | 6016 | 9586 | 37.2% | 62.8% | 226 | 206 | 432 | 52.3% | 47.7% | 15.1% | 175 |
| 2012-13 | 3574 | 6054 | 9628 | 37.1% | 62.9% | 251 | 177 | 428 | 58.6% | 41.4% | 21.5% | 248 |
| 2013-14 | 3435 | 5890 | 9325 | 36.8% | 63.2% | 277 | 245 | 522 | 53.1% | 46.9% | 16.2% | 230 |
| 2014-15 | 3448 | 5871 | 9319 | 37.0% | 63.0% | 282 | 203 | 485 | 58.1% | 41.9% | 21.1% | 277 |
| 2015-16 | 3446 | 5967 | 9413 | 36.6% | 63.4% | 287 | 254 | 541 | 53.0% | 47.0% | 16.4% | 243 |
| 2016-17 | 3430 | 6141 | 9571 | 35.8% | 64.2% | 258 | 276 | 534 | 48.3% | 51.7% | 12.5% | 186 |
| 2017-18 | 3483 | 6047 | 9530 | 36.5% | 63.5% | 262 | 257 | 519 | 50.5% | 49.5% | 13.9% | 198 |
| 2018-19 | 3358 | 5987 | 9345 | 35.9% | 64.1% | 259 | 262 | 521 | 49.7% | 50.3% | 13.8% | 200 |
| 2019-20 | 3305 | 5878 | 9183 | 36.0% | 64.0% | 276 | 252 | 528 | 52.3% | 47.7% | 16.3% | 239 |
| 2020-21 | 3173 | 5686 | 8859 | 35.8% | 64.2% | 249 | 190 | 439 | 56.7% | 43.3% | 20.9% | 256 |
| 2021-22 | 3021 | 5295 | 8316 | 36.3% | 63.7% | 237 | 208 | 445 | 53.3% | 46.7% | 16.9% | 207 |
| 2022-23 | 2871 | 4961 | 7832 | 36.7% | 63.3% | 242 | 212 | 454 | 53.3% | 46.7% | 16.6% | 206 |
| 2023-24* | 2888 | 4876 | 7764 | 37.2% | 62.8% | 396 | 211 | 607 | 65.2% | 34.8% | 28.0% | 458 |
| 2024-25** | 2925 | 4973 | 7898 | 37.0% | 63.0% | 258 | 216 | 474 | 54.4% | 45.6% | 17.4% | 223 |
| 2025-26*** | 2925 | 4973 | 7898 | 37.0% | 63.0% | 261 | 231 | 492 | 53.0% | 47.0% | 16.0% | 213 |

*SFA EDEA Report: reports a massive increase (+154) in male participation from 242 in '22-'23 to 396 in '23-'24:  baseball (+20,  track (+56), football (+76), golf (+1). Women's participation decreased by more from 212 to 211. No coed sports reported in any year.

**EADA data unavailable.  Undergraduate full time enrollment data based on SFA *Common Data Set 2024-25*  data retrieved from https://www.sfasu.edu/docs/institutional-research/common-data-set-complete-24-25.pdf  Athlete participation counts from web site 2024-25 rosters. Retrieve from: https://sfajacks.com/

*** Projected 2025-26 based on current sports retrieved from https://sfajacks.com/; 2024-25 enrollment data per SFA Common Data Set 2024-25 data retrieved from https://www.sfasu.edu/docs/institutional-research/common-data-set-complete-24-25.pdf; and maximum 2025-26 Division I roster limits permitted by House v. NCAA settlement retrieved from: https://www.collegesportscommission.org/roster-limits

94.    SFA does not meet the second part of the three-part test either. It cannot show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex.

95.    The elimination of the women's beach volleyball, bowling, and golf teams, without more, precludes SFA from satisfying part two of the three-part test. It simply cannot demonstrate a history and continuing practice of expanding opportunities for the underrepresented sex while cutting established teams.

96.    In fact, the only women's teams SFA has added since 2003 are beach volleyball, bowling, golf, and equestrian,[6] all of which SFA has now eliminated.

97.    In contrast, in 2004, it added a men's baseball team that provided 38 new participation opportunities for men.

98.    Finally, SFA cannot satisfy the third part of the three-part test: that the interests and abilities of the female athletes are fully and effectively accommodated by the present program. Again, the elimination of the women's beach volleyball, golf, and bowling teams prevents SFA from doing so.

99.    SFA's failure to provide equal participation opportunities to women is intentional sex discrimination. *See Pederson*, 213 F.3d at 882; *Mansourian*, 602 F.3d at 968 ("Universities' decisions with respect to athletics are . . . 'always—by definition—intentional.'").

100.    Moreover, SFA's decision to eliminate the women's beach volleyball, bowling, and golf teams was intentional sex discrimination, made with a discriminatory motive, because when SFA made the decision, it knew it was already depriving women of equal participation opportunities and the teams' elimination would deprive women of even more opportunities to participate.

101.    In January 2025, a Title IX consultant regularly retained by SFA, Helen Grant Consulting, submitted its *Stephen F. Austin University 2024 Title IX Summary* to the school after conducting a Title IX compliance audit on its athletics program.

102.    Helen Grant Consulting's *Title IX Summary* informed SFA that it was not providing equal participation opportunities to its female students.

---

[6] The women's equestrian team was added in 2005 and cut in 2009, eliminating 22 participation opportunities for female athletes.

103.    To move towards Title IX compliance, Helen Grant Consulting's *Title IX Summary* recommended that SFA *continue* its existing women's teams and *add* two additional women's teams.

104.    Instead of adding women's teams, SFA made a deliberate decision to eliminate three women's teams based on their sex.

105.    The NCAA requires Division I schools to sponsor a minimum of seven men's teams and seven women's teams, or six men's teams and eight women's teams.

106.    Prior to the eliminations, SFA sponsored seven men's teams (baseball, basketball, cross country, football, golf, indoor track and field, and outdoor track and field) and eleven women's teams (basketball, beach volleyball, bowling, cross country, golf, soccer, softball, tennis, indoor track and field, outdoor track and field, and indoor volleyball).

107.    SFA chose to eliminate three women's teams and only one men's team to maintain its NCAA Division I minimum sports sponsorship requirement for men's sports despite knowing that it was already depriving women of equal participation opportunities in violation of Title IX.

## INJUNCTIVE RELIEF

108.    Plaintiffs are entitled to preliminary and permanent injunctive relief that requires SFA to (a) preserve the women's beach volleyball, bowling, and golf teams—and all other women's teams—until SFA is and will be providing women with the equal opportunities to participate in varsity intercollegiate athletics that Title IX requires,  and (b) develop and implement a plan that ensure SFA will be providing women with those opportunities as quickly as possible.

109.    Failure to grant the requested injunctive relief will mean that SFA's sizeable Title IX violations will continue and worsen, pushing actual compliance for female students even further down the road.

110.     Additionally, failure to grant the requested injunctive relief will cause irreparable harm to the Plaintiffs and the proposed class members by allowing SFA's discrimination against them to persist and by forever denying them an equal opportunity to participate in varsity intercollegiate athletics at SFA.  Many athletes are considering whether or not to abandon their education at SFA due to these cuts.

111.     If SFA is not restrained from eliminating women's varsity beach volleyball, bowling, and golf, Plaintiffs and members of these teams will never again have the opportunity to participate in this valuable educational experience at SFA—one that provides academic, physical, psychological, social, and even economic benefits.  For many of them who are seniors, it likely spells the end of their athletic careers.

112.     There is no adequate after-the-fact remedy at law for these harms.

113.     If the Court were to act quickly, the athletes on the women's beach volleyball, bowling, and golf teams would be able to prepare for and participate in competition during the 2025-26 season.  Sadly, several will likely follow through with their transfer plans as they had little time to make a decision, but many student-athletes will have their rights and their sport preserved.

114.     Similarly, the coaches and staff would be able to work with the athletes during this academic year and prepare for the full 2025-26 season, including by recruiting, budgeting, scheduling competition for the season, and ensuring proper facilities are available.

115.     As more time passes, if the teams are not preserved, it will become increasingly difficult—if not impossible—for the teams and athletes to train and prepare adequately for the next season.

116.    The continuing, irreparable harm caused by SFA's discriminatory actions far outweighs any possible harm that granting the injunctive relief might cause SFA.

117.    Preliminarily enjoining SFA from eliminating the varsity women's beach volleyball, bowling, and golf teams—and all other women's teams—would merely ensure continuation of the status quo during this litigation, because these athletes have limited (if any) opportunities to pursue their interests and abilities elsewhere.

118.    SFA will suffer no harm by continuing the women's varsity beach volleyball, bowling, and golf teams, other than the monetary cost of the teams SFA has already borne for many years.

119.    The permanent harm caused to Plaintiffs by SFA's discrimination is irreparable and can never be adequately compensated with money. This harm far outweighs any monetary cost incurred by SFA to continue the women's beach volleyball, bowling, and golf teams or to add athletic opportunities for women.

120.    Importantly, SFA could choose to allocate its budget and athletic opportunities more equitably merely by shifting its longstanding favoritism toward men to a more equal allocation between men and women.

121.    Meanwhile, SFA will gain public relations and enrollment advantages by coming into compliance with Title IX and by offering more opportunities for its female students.

122.    The injunctive relief that Plaintiffs request will promote the public interest by increasing educational opportunities for female students, decreasing sex discrimination against female student-athletes and potential student-athletes in SFA's intercollegiate athletic program, and requiring SFA to comply with federal law.

123.    Congress decided that ending such discrimination is in the public interest when it enacted Title IX. It has reaffirmed that public interest over the past 53 years by defeating every attempt to weaken the athletic equality requirements of Title IX. Equal opportunity for all students—male and female—is at the core of this case, is at the core of American values, and is clearly in the public interest.

## CLASS ALLEGATIONS

124.    Plaintiffs bring this action on behalf of themselves and a class of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2).

125.    Plaintiffs seek to represent a class of all present and future women students and potential students at SFA interested in participating on women's varsity intercollegiate athletic teams that SFA does not currently offer, including women's varsity beach volleyball, bowling, and golf.

126.    Each of the named Plaintiffs is a member of the proposed class and has been injured by SFA's sex discrimination in SFA's varsity athletic program. The announced elimination of SFA's women's varsity beach volleyball, bowling, and golf exacerbates the discrimination by eliminating female athletic participation opportunities at SFA.

127.    Because Title IX requires a program-wide comparison of the sex-segregated men's and women's athletic programs, the Title IX issues in this action are inherently class-based.

128.    The proposed class meets the "numerosity" requirement of Federal Rule of Civil Procedure 23(a)(1) because there are over 200 female student-athletes at SFA and joinder of them all is impracticable.

129.    The proposed class also meets those requirements because joinder of all class members and all persons harmed by SFA's ongoing sex discrimination in SFA's varsity intercollegiate athletic program is not just impracticable, but impossible.

130.    The proposed class is known to exist, but the members of the class will change during this litigation because of the nature of college enrollment and athletic participation. Students at SFA generally aim to graduate four years after they matriculate. Athletes are often eligible to participate in their sport for only four years. Accordingly, the members of the class harmed by SFA's discrimination will change as each outgoing class of students graduates and another incoming class of students enrolls at SFA.

131.    Not all members of the plaintiff class are currently identifiable because the class includes prospective and future students who will enroll at SFA during this litigation or who will be deterred from enrolling because of SFA's failure to provide athletic participation opportunities for female student-athletes, including the sports in which they want to participate.

132.    Not all members of the plaintiff class are currently identifiable because the class includes not only women's beach volleyball, bowling, and golf players, but also all present, prospective, and future female students who want to participate in other varsity intercollegiate sports that are not offered at SFA.

133.    Plaintiffs are not aware of SFA having surveyed its present or prospective student body to assess athletic interests and abilities.

134.    Moreover, because SFA recruits high school students and transfer students from around the world, SFA could increase and thus realize athletic participation opportunities for female students by starting virtually any new women's varsity sports team and then recruiting women to enroll and participate.

135.    It is unknown how many present, prospective, or future female student-athletes would enroll at SFA or would participate in athletics at the university if it stopped discriminating against women. The hundreds of additional student-athletes who might be recruited, apply, or participate in SFA's varsity intercollegiate athletic program if SFA added the necessary athletic opportunities to provide equal opportunities for women are too numerous to make joinder practicable.

136.    Joinder is impracticable because the class includes members whose identities are not currently known. There are present female students at SFA who cannot currently be identified by Plaintiffs, but who would participate in varsity athletics at SFA if it did not intentionally discriminate in the operation of its athletic program or if it offered the sports or events in which they want to participate.

137.    Joinder is impracticable because the class includes unknown and unidentifiable prospective and future students who will enroll at SFA during this litigation or who will be deterred from enrolling at SFA because of the sex discrimination in the school's varsity intercollegiate athletic program.

138.    The proposed class satisfies the "commonality" requirement of Federal Rule of Civil Procedure 23(a)(2) because there are many questions of law and fact common to the proposed class, including whether SFA is providing women with equal opportunities to participate in varsity intercollegiate athletics.

139.    Plaintiffs satisfy the "typicality" requirement of Federal Rule of Civil Procedure 23(a)(3) because their claims are typical of those of the proposed class. They all have been denied, are continuing to be denied, or will be denied equal opportunities to participate in varsity intercollegiate athletics because of SFA's ongoing sex discrimination.

140.    Plaintiffs want the Court to prohibit SFA from eliminating women's varsity intercollegiate athletic opportunities and to require SFA to preserve the women's beach volleyball, bowling, and golf teams and comply with Title IX.

141.    Plaintiffs are members of the proposed class and will fairly and adequately represent the interests of the class pursuant to Federal Rules of Civil Procedure 23(a)(4). They intend to prosecute this action vigorously to secure fair and adequate injunctive relief for the entire class and have retained counsel with significant experience and success prosecuting Title IX class actions against universities.

142.    The proposed class satisfies Federal Rule of Civil Procedure 23(b)(2) because SFA has acted or refused to act on grounds generally applicable to the class, so that final injunctive or corresponding declaratory relief is appropriate with respect to the class as a whole.

143.    Undersigned counsel have devoted substantial time to identifying and investigating the potential claims in this action, have developed detailed knowledge of the facts and the applicable law, and have sufficient resources to commit to representing this putative class as interim counsel under Federal Rule of Civil Procedure 23(g)(3) until such time as this Court determines whether to certify the action as a class action.

## COUNT I

### Title IX

### Unequal Allocation of Athletic Participation Opportunities
### (By the Plaintiffs and Plaintiff Class)

144.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

145.    Plaintiffs bring this claim on behalf of themselves and those similarly situated as a class action as set forth in the Class Allegations.

146.   SFA determines the number of athletic participation opportunities that it will provide to male and female students by choosing which sports it will offer to each sex and deciding how many athletes it will allow to participate on each team.

147.   SFA's failure to provide women with equal opportunities to participate in varsity intercollegiate athletics is intentional sex discrimination.

148.   SFA fails to provide female students with equal opportunities to participate in varsity intercollegiate athletics in violation of Title IX.

149.   SFA fails to provide female students with equal opportunities to participate in varsity intercollegiate athletics in violation of 34 C.F.R §106.41.

150.   SFA also fails to comply with each part of the three-part test, described above, to demonstrate compliance with the requirements of Title IX.

151.   SFA does not provide female students with varsity intercollegiate athletic participation opportunities in numbers substantially proportionate to female undergraduate enrollment.

152.   SFA is eliminating three fully rostered varsity teams that have female participants with the interest, ability, and competition available to play.

153.   SFA cannot show a history or continuing progress of program expansion for women. Instead, by eliminating women's beach volleyball, bowling, and golf, SFA is contracting its program for women.

154.   SFA is not fully and effectively accommodating women's interests and abilities in its varsity intercollegiate athletic program.

155.   Plaintiffs have the interest and ability to participate in women's varsity beach volleyball, bowling, and golf.

156.    High school students (the source of SFA's incoming, prospective, and future students) also have the interest and ability to participate in beach volleyball, bowling, and golf.

157.    Competition exists in women's beach volleyball, bowling, and golf because it is a major NCAA sport and SFA has offered the sport for many years—as have other schools in the NCAA.

158.    SFA will continue and exacerbate its existing pattern and practice of sex discrimination in the allocation of athletic participation opportunities if it is not restrained from eliminating female athletic participation opportunities, including in women's beach volleyball, bowling, and golf.

159.    Plaintiffs seek a declaration that SFA engaged in discrimination on the basis of sex by failing to offer female students equal opportunities to participate in intercollegiate athletics at SFA.

160.    Plaintiffs seek expedited preliminary and permanent injunctive relief requiring SFA to stop violating Title IX by depriving women of equal opportunities to participate in varsity intercollegiate athletics and to continue the women's beach volleyball, bowling, and golf teams, and all other women's varsity teams, at SFA in the 2025-26 academic year and beyond, unless and until SFA is and will be providing women with equal opportunities to participate in compliance with Title IX.

161.    As a result of SFA's discriminatory actions, Plaintiffs have been denied their civil right to receive equal opportunities to participate in varsity intercollegiate athletics free of sex discrimination.

162.    They have been denied the educational, economic, physical, psychological, and social benefits of athletic participation. They have also been and are being treated as second-class citizens, which has stigmatizing effects.

163.    If SFA is not restrained from eliminating the women's beach volleyball, bowling, and golf teams, these athletes will forever lose the opportunity to participate in intercollegiate sports at SFA—an opportunity that can last only four years, but provides a lifetime of educational, economic, physical, psychological, and social benefits.

164.    As such, Plaintiffs and all members of the equal athletic participation class are entitled to the relief requested herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Certify this case as a class action on behalf of all present and future women students and potential students at SFA interested in participating on women's varsity intercollegiate athletic teams that SFA does not currently offer, including women's varsity beach volleyball, bowling, and golf; appoint Plaintiffs as class representatives; and appoint Plaintiffs' counsel as class counsel;

B.    Declare that SFA has engaged in a past and continuing pattern and practice of discrimination against female students on the basis of sex in the operation of its varsity intercollegiate athletics program, in violation of Title IX and the regulations promulgated thereunder;

C.    Issue preliminary and permanent injunctions barring SFA from depriving women of equal opportunities to participate in varsity intercollegiate athletics and eliminating the women's beach volleyball, bowling, and golf teams—or any other women's varsity teams—unless and until SFA is and will be in compliance with Title IX.

D.      Maintain jurisdiction over this action to monitor SFA's compliance with this Court's orders;

E.      Award Plaintiffs their reasonable attorneys' fees and expenses pursuant to 42 U.S.C. § 1988; and

F.      Order such other and further relief as the Court deems appropriate.

Dated: September 4, 2025.

Respectfully submitted,

*/s/ Ashlyn L. Hare*
John Clune (Pro Hac Vice)
Ashlyn Hare (Pro Hac Vice)
HUTCHINSON, BLACK, and COOK, LLC
921 Walnut Street Ste 200
Boulder, CO  80302
Phone: (303)442-5614
Fax: (303) 442-6593
Email: john.clune@hbcboulder.com
        ashlyn.hare@hbcboulder.com

Arthur Bryant (Pro Hac Vice) (Lead Counsel)
ARTHUR BRYANT LAW, P.C.
1999 Harrison Street, 18th Floor
Oakland, CA 94612
Phone: (510)-391-5454
Fax: N/A
Email: arthur@arthurbryantlaw.com

James L. Sowder, SBN 18863900
Ellen R. Platt, SBN 24131594
THOMPSON, COE, COUSINS & IRONS, LLP
700 N. Pearl St. 25th Floor
Dallas, TX  75201
Phone: (214) 871-8200
Fax: (214)871-8209
Email: jsowder@thompsoncoe.com
        eplatt@thompsoncoe.com

*Counsel for Plaintiffs*